**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WHOOP, INC.,

*Plaintiff*,

v.

FINERPOINT, INC. d/b/a BEVEL,

*Defendant*.

C.A. No. 26-289-MN

**DEFENDANT FINERPOINT, INC. d/b/a BEVEL OPENING BRIEF IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Of Counsel:

Brian C. Horne (*Pro Hac Vice*)
Hans L. Mayer (*Pro Hac Vice*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 400
Los Angeles, CA 90067
(310) 551-3450
brian.horne@knobbe.com
hans.mayer@knobbe.com

Matthew S. Bellinger (*Pro Hac Vice*)
Jeremiah S. Helm (*Pro Hac Vice*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404
matt.bellinger@knobbe.com
jeremiah.helm@knobbe.com

Michael Forman (*Pro Hac Vice*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
1717 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20006
(202) 640-6400
michael.forman@knobbe.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

*Attorneys for Defendant Finerpoint, Inc. d/b/a Bevel*

Dated: May 26, 2026

# TABLE OF CONTENTS

**Page No.**


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

A. The ’279 Patent ........ 2

B. The ’226 Patent ........ 4

C. The ’946 and ’112 Patents ........ 4

D. The Trade Dress Claim ........ 6

III. LEGAL STANDARD ........ 6

A. Rule 12(b)(6) Motion to Dismiss ........ 6

B. Patent Eligibility ........ 6

C. Trade Dress ........ 7

IV. ARGUMENT ........ 7

A. The Patent Claims Are Not Patent Eligible ........ 7

1. *Alice* Step One: The Claims Are Directed To An Abstract Idea ........ 8

2. *Alice* Step Two: Additional Elements Do Not Transform the Claims ........ 15

3. The Claims Identified in Whoop’s Complaint are Representative ........ 17

B. The Complaint Does Not Sufficiently Define Whoop’s Alleged Trade Dress ........ 18

V. CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Page No(s).**


*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016)....12

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014).... *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....6

*Benak v. Alliance Capital Mgmt. L.P.*,
435 F.3d 396 (3d Cir. 2006)....9

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024) ....7

*Caliko, SA v. Finn & Emma*,
LLC, No. 21-CV-3849 (VEC), 2022 WL 596072 (S.D.N.Y. Feb. 28, 2022) ....19

*Cardiacsense Ltd. v. Garmin Int'l, Inc.*,
776 F. Supp. 3d 644 (E.D. Mich. 2025)....14

*CardioNet, LLC v. InfoBionic, Inc.*,
816 F. App'x 471 (Fed. Cir. 2020) ....7, 13

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019)....12, 16

*Constellation Designs, LLC v. LG Elecs. Inc.*,
--- F.4th ----, 2026 WL 1141206 (Fed. Cir. Apr. 28, 2026)....12

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)....15, 17

*Driver v. Astrue*,
No. 1:07-cv-3014-AJB, 2009 WL 631221 (N.D. Ga. Mar. 9, 2009)....2, 8

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)....11, 15, 16

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)....12

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*Fair Wind Sailing, Inc. v. Dempster*,
764 F.3d 303 (3d Cir. 2014)....7, 18, 19, 20

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016)....11

*Genetics Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016)....7

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026)....12

*Int'l Leisure Prods., Inc. v. FUNBOY LLC*,
747 F. App'x 23 (2d Cir. 2018)....19

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
850 F.3d 1332 (Fed. Cir. 2017)....11

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018)....12

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
113 F.3d 373 (2d Cir. 1997)....18

*Lutz v. Portfolio Recovery Assocs., LLC*,
49 F.4th 323 (3d Cir. 2022)....6

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012)....7, 17

*Nat'l Lighting Co. v. Bridge Metal Indus., LLC*,
601 F. Supp. 2d 556 (S.D.N.Y. 2009)....19

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021)....15

*Philips N. Am. LLC v. Fitbit LLC*,
626 F. Supp. 3d 292 (D. Mass. 2022)....13

*Polar Electro Oy v. Suunto Oy*,
No. 1:17-cv-0139 CW, 2024 WL 1492622 (D. Utah Apr. 5, 2024)....13, 15

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

*Procter & Gamble Co. v. QuantifiCare Inc.*,
288 F. Supp. 3d 1002 (N.D. Cal. 2017) ....................14

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
65 F.4th 698 (Fed. Cir. 2023) ....................7

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018)....................11, 12

*Sara Designs, Inc. v. A Classic Time Watch Co.*,
234 F. Supp. 3d 548 (S.D.N.Y. 2017)....................19

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
873 F.3d 1364 (Fed. Cir. 2017)....................17

*Solutran, Inc. v. Elavon, Inc.*,
931 F.3d 1161 (Fed. Cir. 2019)....................11

*Synopsys, Inc. v. Mentor Graphics Corp.*,
839 F.3d 1138 (Fed. Cir. 2016)....................15

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001)....................3

*Thumbtack, Inc. v. Liaison, Inc.*,
No. 23-CV-02830-WHO, 2024 WL 235172 (N.D. Cal. Jan. 22, 2024) ....................19

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017)....................11

*Ubisoft Entm't, S.A. v. Yousician Oy*,
401 F. Supp. 3d 644 (E.D.N.C. 2019), *aff'd,* 814 F. App'x 588 (Fed. Cir. 2020) ....................14

*Uniloc USA, Inc. v. Amazon.com, Inc.*,
243 F. Supp. 3d 797 (E.D. Tex. 2017) ....................3

**TABLE OF AUTHORITIES**
**(*cont'd*)**

**Page No(s).**

**OTHER AUTHORITIES**

35 U.S.C. § 101 ........................................ 1, 7

Patent Act ........................................ 6

Rule 12 ........................................ 7

Finerpoint, Inc. d/b/a Bevel ("Bevel") moves to dismiss Whoop, Inc.'s ("Whoop") claims for patent infringement (Counts III-VI) and trade dress infringement (Count II).

## I. INTRODUCTION

Parents throughout time tell their children an unavoidable fact of life: after a long day filled with activity, you need some sleep and are going to bed early. As children mature into adults, they learn the corollary: after a hard day you should take it a little easier the next day, get more sleep, and let yourself recover. Whoop's patent claims at issue are directed to that abstract idea: if your body is under strain, be it by exercise, lack of sleep, or through your body's hormonal cycle, you need time to recover. Instead of articulating a patentable invention, however, the claims use functional language to define that goal, and recite only generic analyses or calculations using conventional measurements of naturally occurring phenomena. Courts have routinely held analogous claims reciting steps of collecting and analyzing data, or carrying out calculations, are directed to abstract ideas and not patent eligible under 35 U.S.C. § 101. Because the claims here likewise do not recite patentable subject matter, the Court should dismiss all of Whoop's patent infringement claims.

Whoop's trade dress claim presents a different issue but likewise has a fatal flaw. Whoop alleges "the combination" of eleven separate features as the "WHOOP Trade Dress." D.I. 1 ¶ 66. Many of the alleged features are, themselves, vague and ill-defined, such as "colorful" features or the "prominent use" of "rectangles having rounded edges" or "powder blue accents." *Id.* The Complaint says little, if anything, as to how the eleven disparate elements of the purported trade dress are arranged with respect to each other and does not sufficiently describe the overall appearance of the trade dress. Further adding to the uncertainty of the scope and meaning of the purported trade dress, the Complaint alleges that images with only one or a few of the eleven features—not the combination of all eleven—nevertheless "embody the WHOOP Trade Dress."

*See, e.g.*, *id.* ¶¶ 78-79. Because the Complaint fails to sufficiently articulate Whoop's alleged trade dress, the Court should also dismiss Whoop's trade dress infringement claim.

## II. BACKGROUND

This action involves four patents, U.S. Patent Nos. 11,602,279 (D.I. 1-12, "the '279 patent"), 11,627,946 (D.I. 1-13, "the '946 patent"), 12,220,112 (D.I. 1-14, "the '112 patent"), and 12,318,226 (D.I. 1-15, "the '226 patent"). Among other things, the Complaint also alleges trade dress infringement.[1]

### A. The '279 Patent

The '279 patent is entitled "Automated Exercise Recommendations." '279 patent, Title. The specification provides, as background, that "[m]onitoring heart rate is critical for athletes in understanding their fitness levels and workouts over time." *Id.*, 1:19-26. The patent states that "[c]ertain conventional heart rate monitors" are "too obtrusive." *Id.*, 1:27-37. It likewise acknowledges that "[e]xisting fitness monitors," which "often include the functionality of a watch," include "bulky components" and may be "inconvenient for continuous wear." *Id.*, 7:21-25. The patent claims recite a generic physiological monitor without any structural limitations.

When describing exemplary embodiments, the '279 patent discusses an intensity score that "is calculated based on the user's heart rate reserve (HRR)…." *Id.*, 26:24-27. HRR was a known metric "used to describe the difference between a person's measured or predicted maximum heart rate and resting heart rate." *Driver v. Astrue*, No. 1:07-cv-3014-AJB, 2009 WL 631221, at *5 n.22 (N.D. Ga. Mar. 9, 2009) (citing http://www.ncbi.nlm.nih.gov/pubmed/12471290). The specification includes generic formulas to convert heart rate to HRR values, to weight HRR values "according to a suitable weighting scheme," and to normalize and scale the resulting summed

[1] Bevel will answer Whoop's copyright claim (Count I) after the Court has issued its decision on this Motion.

values "to generate user-friendly intensity score values," for example on a scale from 0 to 21. '279 patent, 26:24-27:10; *see also* 27:11-29:31 (example calculations).

The '279 patent also discusses a "recovery score or indicator," based on heart rate variability (HRV), and a "sleep score," which is related to "sleep efficiency" and "sleep duration." *Id.*, 29:32-31:46. The patent admits that HRV "is a commonly studied" value that reflects two parts of the human nervous system: the "parasympathetic (deactivating)" aspect that "reflects inputs from internal organs" and the "sympathetic (activating)" aspect that "increases in response to stress, exercise and disease." *Id.*, 29:34-44. The patent states "the analytics system generates a sleep score" from "four streams of data," namely "heart rate, skin conductivity, ambient temperature and accelerometer/gyroscope data," without explaining how the analytics system does so. *Id.*, 30:47-64. The claims recite "calculating a sleep score" based on generic "physiological monitor" data, and "generating a recovery score" with an undefined "weighted combination" of HRV and sleep score. *Id.*, claim 1; *see also* claim 17 ("generating . . . based on" HRV and resting heart rate). The patent indicates that the claimed analysis can be performed on virtually any combination of known computing devices. *See, e.g.*, *id.*, 38:41-55; *see generally id.*, 38:41-46:52 (listing, *inter alia*, conventional computers, software, and networks).

The '279 patent purports to incorporate three documents by reference. "When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the host document as if it were explicitly contained therein." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001). Such documents are "sufficiently part of the intrinsic record to be considered on [a] Motion to Dismiss." *Uniloc USA, Inc. v. Amazon.com, Inc.*, 243 F. Supp. 3d 797, 811 n.8 (E.D. Tex. 2017). The "CNA Training Help" webpage, cited at 11:15-16, describes monitoring heart rate via pulse and states that a

"higher than normal pulse rate is usually the result of exercise [or] stress," among other things. Ex. A at 1.[2] Charlot, cited at 21:65-22:3, states that HRV "is a well-known method" and "a promising tool to predict daily training load," "to assess training adaptations, degree of fatigue or even overtraining." Ex. B at 1357-1358. Lu, cited at 22:3-7, states that HRV: "is known to be a noninvasive indicator reflecting the dynamic interplay between perturbations to cardiovascular function and the dynamic response of the cardiovascular regulatory system." Ex. C (Abstract).

**B. The '226 Patent**

The '226 patent claims are related to calculating a "sleep need" for a user based on "an objective measure of strain" and "sleep debt." '226 patent, claim 4. The patent states: "Sleep debt (the effect of not getting enough sleep) may result in the diminished abilities to perform high-level cognitive functions." *Id.*, 22:3-9. Sleep need may be calculated using "any suitable inputs," for example by using an algorithm that takes baseline sleep, adjusts for strain and sleep debt, and then subtracts naps: "SleepNeed = Baseline + $f_1$(strain) + $f_2$(debt) – Naps". *Id.*, 24:59-25:11.

**C. The '946 and '112 Patents**

The '946 and '112 patents both claim priority to the same provisional application and contain effectively identical specifications. Both patents "generally relate[] to generating coaching recommendations based on physiological hormonal cycles such as the menstrual cycle." '946 patent, 1:10-15. Both patents provide, as background, that "different phases of…hormonal cycles may affect one's health, fitness, recovery, sleep, and the like in different manners." *Id.*, 1:18-22. An example is that "during the luteal phase of a menstrual cycle, women may be prone to having a delayed sweat response, increased respiration, increased central nervous system fatigue, and increased muscle breakdown." *Id.*, 1:22-25. Both patents incorporate Sims (Ex. D), a fitness book

[2] Citations to "Ex. __" are to exhibits to the Declaration of Jeremiah S. Helm, filed concurrently herewith. Voluminous exhibits excerpted but can be provided to the Court if desired.

from 2016, to exemplify how "[t]he menstrual cycle can impact performance." *Id.*, 57:18-49. Sims includes charts that track hormone levels during different phases (follicular phase and luteal phase). Ex. D at 18. Among other things, Sims states:

- the "menstrual cycle…can significantly affect your training and performance," that "women have two hormone phases each month: high and low" and that the high hormone phase "makes exercise feel harder than usual." *Id.* at ix-x.
- that "once your period starts…all those energy systems used in the high-hormone phase are at your disposal for exertion. Same goes for the low-hormone phase that follows your period." *Id.* at 19.
- that "researchers found that the women could make greater strength gains and produce more force when they strength trained during their low-hormone phase compared to training in the high-hormone phase." *Id.*
- that exercise will "feel harder during those high-hormone days." *Id.* at 20.
- that "cyclical" hormonal changes "impact your exercise metabolism." *Id.*
- in a low-hormone stage, it is "likely to feel less pain and recover faster." *Id.* at 19.
- that "increased melatonin production during the low-hormone phase helps…encourage sleep, but in the high-hormone phase, progesterone interferes with melatonin release and effectiveness, resulting in…more disrupted sleep." *Id.* at 49.
- that heart rate monitoring and heart rate can be "influenced" by "menstruation, rest (or lack thereof), hormones," and other factors. *Id.* at 251.

The patents state that the menstrual cycle phase "may be determined," *e.g.*, by using "heart rate data (e.g., HRV, RHR, RR, and so on)," "respiratory data," "temperature data, and so forth," or may be "received manually." '946 patent, 57:60-67; 63:47-59. The patents include many disclosures from the prior art '279 patent application's publication, including the sections related to physiological measurements, scores (*e.g.*, intensity, recovery and sleep), and general-purpose computers and software. *Compare, e.g.*, '946 patent, 13:31-39:37 *with* '279 patent, 17:50-44:5. The patents also incorporate parts of the disclosure from the '226 patent (prior art via the '226

parent application's publication, US 2019/0110755) regarding sleep. *Compare* '946 patent, 43:47-48:15 *with* '226 patent, 21:16-25:48.

### D. The Trade Dress Claim

The Complaint alleges that "the overall appearance of the WHOOP App" includes eleven features, "the combination of which creates a distinctive look and feel to the WHOOP App ('the WHOOP Trade Dress')." D.I. 1 ¶ 66. The Complaint includes a series of images and alleges each individual image "embodies" or "feature[s]" the Whoop Trade dress. *Id*. ¶¶ 74-80, 83-86.

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility analysis involves three steps: (1) " an articulation of the elements of the claim"; (2) "disregarding any 'formulaic recitation of the elements of a ... claim' or other legal conclusion… as well as allegations that are 'so threadbare or speculative that they fail to cross the line between the conclusory and the factual,'"; and (3) evaluating "the plausibility of the remaining allegations" by "assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327-28 (3d Cir. 2022) (cleaned up).

### B. Patent Eligibility

Protection under the Patent Act does not extend to "[l]aws of nature, natural phenomena, and abstract ideas," which "are not patentable." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted). The *Alice* analysis has two steps. At step one, a court determines "whether the claims at issue are directed to" ineligible laws of nature, natural phenomena, or abstract ideas. *Id.* at 217. At step two, a court considers the elements of each claim "both

individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id*. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 79 (2012)). "[I]n many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Genetics Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016).

### C. Trade Dress

Trade dress is the total image or overall appearance of a product. *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 (3d Cir. 2014) (citation omitted). Before asserting infringement, a plaintiff must identify "the specific elements which comprise its distinct dress." *Id*. at 309.

## IV. ARGUMENT

### A. The Patent Claims Are Not Patent Eligible

Whoop accuses Bevel of infringing "at least" claims 1 and 17 of the '279 patent, claim 4 of the '946 patent, claim 4 of the '112 patent, and claim 4 of the '226 patent. D.I. 1, ¶¶ 173-176 (claims reproduced in an Appendix to this brief). The common theme across the patents' claims is that they use conventional physiological data from a user, in its typical way, and recite little more than the collection, analysis, and reporting of the data in generalized functional language. Such result-oriented method steps, devoid of structure, are routinely held to be an unpatentable abstract idea. *See, e.g.*, *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1355-57 (Fed. Cir. 2024) (collecting cases). Indeed, the Federal Circuit has concluded that claims to processing physiological measurements, similar to the asserted claims here, are unpatentable abstract ideas. *See, e.g.*, *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 473-74 (Fed. Cir. 2020) (non-precedential). Accordingly, the Court should hold Whoop's patent claims invalid under Section 101 and dismiss Counts III-VI with prejudice. *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023).

### 1. *Alice* Step One: The Claims Are Directed To An Abstract Idea

The claims of each patent amount to nothing more than (i) collecting or using generic physiological data, or sometimes specifically heart rate data, (ii) analyzing the data, using either undefined or conventional steps, and (iii) reporting a result, such as a recommendation for sleep or exercise. The claims include little or no structure, and instead recite known correlations between natural phenomena, such as strain and heart rate, ultimately concluding with the abstract idea that after lots of strain or poor sleep, there is a need for less strain and more sleep.

The **’279 patent**, claim 1, generally illustrates the type of steps used in all four patents and their respective claims. The ’279 patent recites a method that starts by measuring a heart rate, which is admittedly a known “critical” metric for “athletes in understanding their fitness levels and workouts over time.” ’279 patent, 1:19-26; *see also* Ex. A at 1 (pulse rate understood to reflect, among other things, “exercise [or] stress”). Next, claim 1 uses conventional data manipulation, such as calculating heart rate variability (HRV) or heart rate reserve (HRR). The HRV is, admittedly, “a commonly studied” value that reflects “response to stress, exercise and disease.” ’279 patent, 29:34-44; *see also* Ex. C at 23 (HRV “known” metric). The claims use HRV for its conventional purpose: as “a well-known method,” used “to predict daily training load,” and “assess training adaptations, degree of fatigue or even overtraining.” Ex. B at 1357-358. Likewise, “[h]eart rate reserve (HRR) is a term used to describe the difference between a person’s measured or predicted maximum heart rate and resting heart rate.” *Driver*, 2009 WL 631221, at *5 n.22. Converting “heart rate data” into “heart rate reserve data based at least in part on the resting heart rate,” (’279 patent, claim 1), merely normalizes a person’s measured heart rate to the HRR scale. ’279 patent, 26:32-44.

Claim 1 next detects exercise activity without specifying how, a purely abstract and functional step, and generates an “intensity score,” using a generic weighted sum of the HRR data

and heart rate data. ’279 patent claim 1. The applicant conceded during prosecution that a weighted sum was “well known in the art for piecewise weighting a series of values.” Ex. E at 9. And the “assessment of the exercise” using HRR merely reflects that exercise intensity increases heart rate from resting towards the individual’s theoretical maximum, the range provided by the HRR. The Court may take judicial notice of a newspaper article that the idea of “percent of heart rate reserve” as a measure of intensity was in the public realm. *See, e.g.*, “Intensity is one of the hardest things to control and monitor when you exercise,” Statesman Journal (Salem, OR), 2008 WLNR 26641436 (May 22, 2008) (Ex. F); *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401, n.15 (3d Cir. 2006) (judicial notice to “indicate what was in the public realm at the time”).

Claim 1’s method next detects “a physical recovery state” and calculates a “sleep score,” both abstract steps defined purely by their functions. ’279 patent claim 1. The method generates a “recovery score” by combining the HRV (a conventional measure of stress) and the sleep score, effectively claiming the idea that workout intensity and sleep impact how much exercise a person can handle the next day. *Id*. Finally, the method analyzes the “quantitative assessment of the exercise” and the “quantitative assessment of the physical recovery state,” recommends a change to exercise routine, and displays the result to a user. *Id*. Again, this is a purely functional result without any structure beyond the abstract idea that users should plan their exercise (strain) based on their sleep, strain, and previous exercise intensity. Displaying that ultimate recommendation is no different than a person deciding to take it easy after a stressful workout or poor night’s sleep.

The **’226 patent** is, if anything, even more abstract, and is directed to the idea of determining whether a user needs sleep. The ’226 patent, claim 4, recites a method with a step of “receiving” generic “physiological data” that includes heart rate data. ’226 patent, claim 4. The method analyzes “sleep performance” based on the data by “calculating a baseline sleep need,”

but includes no details beyond that bare functional language. *Id*. The method evaluates, "based on the heart rate data," a measure of strain experienced before the "most recent sleep cycle," another functional goal without structure. *Id*. The method calculates a "first sleep debt metric" based on the strain and a "second sleep debt metric" based on "accumulation of prior sleep debt relative to the baseline sleep need." *Id*. Finally, the method calculates "a sleep need" by summing the baseline sleep need and the first and second sleep debt metrics. *Id*. The method, taken as a whole, includes generic functional steps that amount to nothing more than the abstract idea that a user who has been working hard and not getting enough sleep should sleep more.

The <u>**'946 and '112 patents**</u> are similarly abstract. The '946 patent is directed to the abstract idea of recommending sufficient sleep, and the '112 patent is directed to the abstract idea of recommending workout intensity. The generic nature of these patent claims is illustrated by the fact that they include nearly identical steps, with only the goal changed. Thus, both claim 4 of the '946 patent and claim 4 of the '112 patent include steps of acquiring heart rate data and identifying the current phase of a user's hormonal cycle based on the heart rate data (a functional goal without limitation).

The '946 patent identifies a prior sleep history based on the heart rate data (again a functional goal), determines a sleep need based on sleep history, generates a recommended time in bed, and then adjusts that time in bed according to the current phase within the hormone cycle. '946 patent, claim 4. The '112 patent similarly identifies prior sleep activity based on the heart rate data, determines a "recovery level" based on the prior sleep activity, generates a recommended strain for new training activity, and adjusts that strain based on the current phase within the hormonal cycle. '112 patent, claim 4. These patents are ultimately directed to the abstract idea that the recommended exercise intensity or amount of sleep varies depending on the phase of the

menstrual cycle. There is no structure in the claims, only aspirational functional goals, that reflect natural phenomena associated with changing hormone levels.

Courts have not hesitated to hold that analogous claims are directed to an abstract idea at *Alice* step one. "The 'abstract ideas' category embodies the longstanding rule than an idea of itself is not patentable." *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1166 (Fed. Cir. 2019) (quoting *Alice*, 573 U.S. at 218). For example, in *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017), the Federal Circuit determined that claims to "organizing, displaying, and manipulating data of particular documents" were directed to an abstract idea. Likewise, the Federal Circuit held that claims focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis" were directed to an abstract idea. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016). And the Federal Circuit held that a method that recited "selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis" was directed to an abstract idea. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). Thus, collecting information, analyzing that information according to a rule, and reporting the result of that analysis is an abstract idea. *See also FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016).

The common theme of these cases is that claims using results-based functional language—such as "converting," "analyzing," or "detecting," as in Whoop's claims—without any description of how to achieve the results in a non-abstract way, are directed to abstract ideas. *See Elec. Power Grp., LLC*, 830 F.3d at 1351-52, 1354; *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337-38 (Fed. Cir. 2017). The Federal Circuit has repeatedly held that claims must include "the specificity required to transform a claim from one claiming only a result to one

claiming a way of achieving it" to avoid ineligibility. *SAP*, 898 F.3d at 1167. Thus, claims that recite a function generally, but "not a particular way of performing that function," are directed to an abstract idea. *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016); *see also GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1064 (Fed. Cir. 2026) (claims "require[] more than result-focused functional language" to satisfy *Alice* step one).

Here, the claims consistently recite purely functional goals of "analyzing" data, "calculating" metrics, or "identifying" or "determining" results, without any corresponding claimed way to do so. The claims thus fail to recite a concrete and specific implementation of a claimed method; instead, the claims are drafted "in such a result-oriented way that they amount[] to encompassing the 'principle in the abstract' no matter how implemented." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018).

The patents' disclosures do not ameliorate the abstract nature of the claims. Any details in the patents' respective disclosures about exemplary ways to take measurements or perform calculations are not included in the claims. The § 101 inquiry "must focus on the language of the Asserted Claims themselves," and, therefore, "the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (citation omitted). Even if "the specification provides some technical details about the invention," claims that recite nothing more than a broad abstract idea are not patent eligible. *Constellation Designs, LLC v. LG Elecs. Inc.*, --- F.4th ----, 2026 WL 1141206, at *8 (Fed. Cir. Apr. 28, 2026).

The § 101 analysis often involves comparing the claims at issue to claims from prior cases dealing with patent eligibility. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334-35 (Fed. Cir. 2016). That approach is particularly informative here because courts have routinely held similar

claims lacking. For example, in *CardioNet,* 816 F. App'x at 473-74, the patent claims involved a monitoring system that performed steps of processing physiological data, including heart rate data, identifying a physiological event from the data (arrythmia or atrial fibrillation), and displaying "pictographically" the information related to the heart rate and identified event. The Federal Circuit explained that the claims were "directed to collecting, analyzing, and displaying data, which we have repeatedly held to be abstract concepts." *Id*. at 474-75. The court rejected the patentee's argument that "a new metric developed by the inventors that improves cardiac monitoring" conveyed patentability because that metric was, "at most a mathematical computation performed on a general-purpose computing device, which could otherwise be 'performed by a human, mentally or with a pen and paper.'" *Id*. at 476-77 (citation omitted). The claims here similarly collect, analyze, and (in some instances) display physiological data using, at most, computations performed on general-purpose computing devices that could otherwise be performed mentally or with pencil and paper.

In *Polar Electro Oy v. Suunto Oy*, No. 1:17-cv-0139 CW, 2024 WL 1492622, at *5, *9 (D. Utah Apr. 5, 2024), the claims recited a method for assessing a person's energy consumption during exercise. Like this case, *Polar Electro's* claims used broad, results-focused language to describe a process of measuring physiological parameters and calculating energy consumption. *Id.* The court held that the claims were directed to an abstract idea because measuring "heart rate information during exercise," applying calculations and natural correlations, and assessing energy consumption was no more than collecting data, analyzing the data, and reporting the results. *Id.* at *11-12.

*Philips N. Am. LLC v. Fitbit LLC*, 626 F. Supp. 3d 292, 297-98 (D. Mass. 2022), involved claims directed to a method for interactive exercise monitoring where a smartphone collected exercise-related information from a sensor, sent the data to an internet server, received a response

associated with a calculation performed using the exercise-related information, and displayed the results. The court held the claims were directed to an abstract idea because they "recite[d] nothing more than the collection, analysis, and presentation of information, which have been found—individually and collectively—to be abstract concepts." *Id.* at 301. The claims here likewise claim the collection and analysis of standard physiological data, and presentation of the result.

Countless other district court cases hold broad, results-based claims directed to collecting sensor data, performing calculations on that data, and reporting the results are patent ineligible. *Cardiacsense Ltd. v. Garmin Int'l, Inc.*, 776 F. Supp. 3d 644, 649 (E.D. Mich. 2025), held claims directed to a personal device for measuring training activity and calculating data indicative of the training activity were abstract because the claims recited nothing more than simply gathering and processing data. *Ubisoft Entm't, S.A. v. Yousician Oy*, 401 F. Supp. 3d 644, 649-51 (E.D.N.C. 2019), *aff'd,* 814 F. App'x 588 (Fed. Cir. 2020), held claims reciting a computer program that displays guitar lessons, receives user data from a guitar input device, assesses the user's performance based on the received data, and changes the difficultly level based on the user's performance were directed to an abstract idea. *Procter & Gamble Co. v. QuantifiCare Inc.*, 288 F. Supp. 3d 1002, 1018 (N.D. Cal. 2017), held a claim directed to acquiring and analyzing a digital image of a person to locate and quantify skin defects patent ineligible because "acquiring, analyzing, and displaying information is an abstract idea." The claims here fall squarely within this extensive precedent.

Moreover, the claims are not tied to *any* particular platform on which the method must be performed. Instead, for each patent, the claims mimic a person tracking their pulse, strain, sleep, or menstrual cycle, and using that information to decide whether to adjust their workout or get more sleep. Such claims "are so broad as to read on an individual performing the claimed steps

mentally or with pencil and paper." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016); *see also Polar Electro*, 2024 WL 1492622, at *12 ("With the exception of using a watch to help determine a person's heartrate, the steps can be performed mentally or with pencil and paper using known formulas and relationships."). It is "a telltale sign of abstraction" when the claim is directed to "mental processes that 'can be performed in the human mind' or 'using a pencil and paper.'" *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021). Where, as here, the claims involve "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more," they are directed to an abstract idea. *Elec. Power Grp., LLC*, 830 F.3d at 1354.

**2. *Alice* Step Two: Additional Elements Do Not Transform the Claims**

Under step two of the *Alice* framework, the Court must "consider the elements of the claim—both individually and as an ordered combination—to assess whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). "This is the search for an 'inventive concept'—something sufficient to ensure that the claim amounts to 'significantly more' than the abstract idea itself." *Id.* (quoting *Alice*, 573 U.S. at 217-18). A claim may be patent eligible at step two if it includes "additional features" that amount to more than "well-understood, routine, conventional activities previously known to the industry." *Alice*, 573 U.S. at 221, 225 (citation omitted). Claims that "do not introduce a technical advance or improvement" do not contain an inventive concept. *Synopsys*, 839 F.3d at 1152.

The elements of the respective claims—individually and as an ordered combination—do not transform them into patent eligible inventions. As discussed above, the claims use conventional metrics for their known purpose. While the claims use terms such as "generating," "calculating," and "determining," they do not provide specific inventive formulas or algorithms

that must be followed (at most, the claims use conventional techniques like a weighted sum). The claims may be performed by any*one* or any*thing* without the need for any specific or specialized hardware or novel algorithms. And even if the specifications are considered, the specifications make clear that the claimed methods can be performed using conventional components. *Supra* § II (discussing conventional devices and software); *see also Elec. Power Grp., LLC*, 830 F.3d at 1355 (no inventive concept when the claims require the application of an abstract idea on conventional computer components).

The Complaint alleges that each patent is directed to patent-eligible subject matter and cites portions of the patent specifications for support. D.I. 1 ¶¶ 97-104. Whoop cannot use the specifications to fill gaps within the claims, as the patent eligibility analysis must focus on the claim language. *ChargePoint, Inc.*, 920 F.3d at 769. Regardless, the cited portions of the specifications do not convey patentability.

For the ’279 patent, the cited portions of the specification provide descriptions of the intensity score, recovery score, and sleep score, and identify some of the physiological measurements that may be used to calculate these scores. D.I. 1 ¶ 98. But the specification does not demonstrate that these scores, which are claimed in broad and functional terms, are inventive. The idea that the intensity of a workout can be determined by examining a user’s heart rate over time, or that a user’s recovery after a workout can be assessed using heart rate measurements or sleep quality, are not inventions. *See supra*, § II.A (conventional techniques). And the specification admits that information analogous to the sleep score was previously obtained through a conventional sleep study. ’279 patent, 30:47-55.

For the ’226 patent, the cited specification discusses intensity score, recovery score, and sleep score. D.I. 1 ¶ 104. As discussed for the ’279 patent, that disclosure does not demonstrate

any invention, and that is doubly true for the ’226 patent because the ’279 patent’s disclosure is prior art to the ’226 patent. Whoop also cites the specification’s discussion of sleep need, but the idea that a prior lack of sleep (adjusted for naps) and/or an intense workout generates a sleep need is common sense, not an invention.

For the ’946 and ’112 patents, the citations involve determining a phase of the menstrual cycle using heart rate measurements and the idea that the phase of a menstrual cycle impacts a person’s energy levels and sleep need. D.I. 1 ¶¶ 100-102. But Sims (Ex. D), a book from five years before the earliest priority date of the ’946 and ’112 patents, discusses the well-known concept that the phase of a menstrual cycle can impact energy levels or sleep need. *Supra* § II.C. Indeed, Sims states that heart rate, detected by a monitor, changes with the menstrual cycle. Ex. D at 251. But even if monitoring a hormonal cycle using heart rate was a new concept, it would still not convey patentability because the claims require merely applying that natural correlation via a generic identifying step. *Mayo*, 566 U.S. at 79-80.

#### 3. The Claims Identified in Whoop’s Complaint are Representative

The Court may focus its analysis on claims specifically identified in the Complaint (’279 patent claim 1; ’226 patent claim 4; ’946 patent claim 4; and ’112 patent claim 4) as representative. When a patent’s claims are “substantially similar and linked to the same abstract idea,” one claim may be representative for eligibility. *Content Extraction,* 776 F.3d at 1348. Claims that “contain only minor differences in terminology but require performance of the same basic process . . . rise or fall together.” *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1368 n.7 (Fed. Cir. 2017) (citation omitted).

The ’279 patent has two independent claims, 1 and 17, that recite similar steps (though claim 17 does not calculate a sleep score). The dependent claims differ in minor ways that do not impact the patent eligibility analysis. The ’226 patent has three independent claims, 1, 4, and 19,

that each recite similar steps. The corresponding dependent claims differ in minor ways that do not impact the patent eligibility analysis. The '946 patent includes three independent claims, 1, 2, and 4, that recite similar steps. The claims include some differences, such as using the term "hormonal cycle" versus "menstrual cycle," or reciting generic hardware, that do not impact the eligibility analysis. Finally, the '112 patent has three independent claims, 1, 2, and 4, that recite similar steps. The differences in the claims (*e.g.*, "hormonal cycle" versus "menstrual cycle" or generic hardware components) do not impact the eligibility analysis. Accordingly, for this motion, the Court may treat '279 patent claim 1, '226 patent claim 4, '946 patent claim 4, and '112 claim 4 as representative. As set out above, these representative claims are invalid under Section 101.

### B. The Complaint Does Not Sufficiently Define Whoop's Alleged Trade Dress

A plaintiff alleging trade dress infringement must articulate "the specific elements which comprise its distinct dress." *Fair Wind*, 764 F.3d at 309 (citation omitted). Accordingly, there must be a "precise expression of the character and scope of the claimed trade dress." *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 381 (2d Cir. 1997). The Complaint alleges that the "combination" of eleven different things "creates a distinctive look and feel." D.I. 1 ¶ 66. But that list does not sufficiently define the trade dress for multiple reasons.

The first element of the trade dress recites the "synthesis" of metrics to "calculate and present" certain scores. That functional element says nothing about the visual presentation of the trade dress and thus does not define any potentially protectable component of the trade dress. *Fair Wind*, 764 F.3d at 309 ("[T]he alleged trade dress must create *some* visual impression on consumers. Otherwise, there is simply no 'dress' to protect.").

Second, subjective terms such as "colorful" or "prominent" (in elements 2, 6, 7, 9, 11), generic recitation of "icons" (element 8), or optional features (element 9) do not adequately define the trade dress. "The lack of objective metrics, combined with the multiplicity of possible

combinations of optional features, makes it difficult to discern . . . a single distinctive look." *Int'l Leisure Prods., Inc. v. FUNBOY LLC*, 747 F. App'x 23, 25 (2d Cir. 2018) (non-precedential). A "vague description," or "laundry list of elements that constitute a [product's] design" does not state a claim for trade dress infringement. *Nat'l Lighting Co. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 561-62 (S.D.N.Y. 2009) (dismissing on 12(b)(6) motion). Whoop's vague descriptors and laundry list of features do not "articulate the precise nature of the trade dress," so its claim should be dismissed. *See Sara Designs, Inc. v. A Classic Time Watch Co.*, 234 F. Supp. 3d 548, 555 (S.D.N.Y. 2017) (granting motion to dismiss); *see also Caliko, SA v. Finn & Emma*, LLC, No. 21-CV-3849 (VEC), 2022 WL 596072, at *11 (S.D.N.Y. Feb. 28, 2022) (dismissing claims).

Third, the Complaint does not define how the combination of all eleven elements in the "WHOOP Trade Dress," (D.I. 1 ¶ 66), works together to create a "visual impression." For example, the Complaint does not describe how the elements are displayed in relation to each other, and does not seem to include any images where all eleven elements are used in ***combination*** (not individually) to create an overall visual impression. *See Thumbtack, Inc. v. Liaison, Inc.*, No. 23-CV-02830-WHO, 2024 WL 235172, at *7 (N.D. Cal. Jan. 22, 2024) (granting motion to dismiss and requiring plaintiff to define how elements on different webpages "are protected individually or as part of a synthesized whole"). "[T]he alleged trade dress must create *some* visual impression on consumers. Otherwise, there is simply no 'dress' to protect." *Fair Wind*, 764 F.3d at 309. The visual impression of eleven elements ***in combination*** is undefined.

Fourth, the Complaint is internally inconsistent. Though Whoop alleges that the eleven elements in "combination" are the "WHOOP Trade Dress" (D.I. 1 ¶ 66), the Complaint also repeatedly alleges an image with only one or a few of the eleven elements still "embodies the WHOOP Trade dress." *Id.* ¶¶ 74-80, 83, 85. In contrast, the Complaint alleges that examples from

other products "do not feature the WHOOP Trade Dress," but does not explain how those examples, which include rectangles with rounded edges, red, yellow, and green rings, colored bar graphs, or the presentation of health insights in text spanning nearly the entire interface (*id.* ¶ 68), are somehow distinct from similar elements listed for the alleged trade dress. Such inconsistent pleadings regarding the "WHOOP Trade Dress" are insufficient to define its scope.

Whoop must properly identify its trade dress so that Bevel, and the Court, can evaluate what it is and whether it is protectable. Whoop must establish that its unregistered trade dress is source identifying. *Fair Wind*, 764 F.3d at 309. However, the Complaint addresses individual elements in isolation, not all eleven elements in combination. D.I. 1 ¶¶ 69-91. Whoop also must establish that its trade dress is not functional. *Fair Wind*, 764 F.3d at 309. However, the alleged embodiments of the "WHOOP Trade Dress" seemingly perform the functional task of data presentation disclosed (but not claimed) in the asserted patents, including by using circles, graphs, and color coding to convey information to the user. *See, e.g.*, '279 patent, Figs. 12-19B; 31:58-66; 32:42-48; 37:13-35; 38:24-30; *see also*, *e.g.*, D.I. 1 ¶ 66 (alleging, *inter alia*, elements are "metrics…to calculate"; "represent increasingly high" values; "icons to indicate"; "graphs…to indicate average values"; "for navigation"). Whoop's failure to sufficiently define its trade dress prevents Bevel, and the Court, from assessing whether that alleged trade dress is source identifying and not functional.

## V. CONCLUSION

For the reasons set out above, the asserted patents are not directed to patentable subject matter. Accordingly, the patent infringement causes of action (Counts III-VI) should be dismissed with prejudice. In addition, Bevel's trade dress claim (Count II) should be dismissed because the alleged trade dress is not sufficiently defined.

Dated: May 26, 2026

Respectfully submitted,

*/s/ John C. Phillips, Jr.*

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

*Attorneys for Respondent Finerpoint, Inc. d/b/a Bevel*

Of Counsel:

Brian C. Horne (*Pro Hac Vice*)
Hans L. Mayer (*Pro Hac Vice*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 400
Los Angeles, CA 90067
(310) 551-3450
brian.horne@knobbe.com
hans.mayer@knobbe.com

Matthew S. Bellinger (*Pro Hac Vice*)
Jeremiah S. Helm (*Pro Hac Vice*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404
matt.bellinger@knobbe.com
jeremiah.helm@knobbe.com

Michael Forman (*Pro Hac Vice*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
1717 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20006
(202) 640-6400
michael.forman@knobbe.com

# APPENDIX OF PATENT CLAIMS

(all emphasis added)

**’279 Patent Claim 1**

1. A method comprising:

**measuring** a resting heart rate for a user based on continuous heart rate data from a physiological monitor;

**calculating** a heart rate variability based on the continuous heart rate data;

**converting** a time series of heart rate data into a time series of heart rate reserve data based at least in part on the resting heart rate measured for the user with the physiological monitor;

automatically **detecting** exercise activity of the user;

**generating** an intensity score that provides a quantitative assessment of an intensity of the exercise activity using a weighted sum of heart rate reserve data from the time series of heart rate reserve data during the exercise activity;

automatically **detecting** a physical recovery state of the user;

**calculating** a sleep score indicative of a duration and efficiency of sleep by the user based on continuous data collected by the physiological monitor;

**generating** a recovery score that provides a quantitative assessment of the physical recovery state of the user indicating whether the user is recovered and ready for exercise based on a weighted combination of the heart rate variability, and the sleep score;

**analyzing** the quantitative assessment of the exercise activity and the quantitative assessment of the physical recovery state to automatically generate a recommendation on a change to an exercise routine of the user; and

**displaying** the recommendation to the user within a user interface of a visual display device.

**’226 Patent Claim 4**

4. A method for determining a sleep need for a user, the method comprising:

**receiving** physiological data from a wearable device worn substantially continuously by the user, the physiological data including heart rate data;

**analyzing** a sleep performance over an historical time window based on the physiological data and calculating a baseline sleep need for the user based on the sleep performance over the historical time window;

**evaluating**, based on the heart rate data, an objective measure of strain experienced by the user during an interval preceding a most recently sleep cycle;

**calculating** a first sleep debt metric based on the objective measure of a strain;

**calculating** a second sleep debt metric as an accumulation of prior sleep debt relative to the baseline sleep need over one or more preceding sleep cycles; and

**calculating** a sleep need for the user by summing the baseline sleep need, the first sleep debt metric, and the second sleep debt metric.

**’946 Patent Claim 4**

4. A method comprising:

**acquiring** heart rate data for a user from a wearable physiological monitoring device;

**identifying** a hormonal cycle and a phase within the hormonal cycle for the user;

**identifying** a prior sleep history for the user based on the heart rate data;

**determining** a current sleep need for the user based on a prior sleep history for the user;

**generating** a first recommended time in bed for the user based on the current sleep need; and

**determining** a second recommended time in bed for the user by adjusting the first recommended time in bed according to the phase within the hormonal cycle.

**’112 Patent Claim 4**

4. A method comprising:

**acquiring** heart rate data for a user from a wearable physiological monitoring device worn by the user over one or more hormonal cycles;

**identifying** a hormonal cycle and a phase within the hormonal cycle for the user based on the heart rate data;

**identifying** a prior sleep activity for the user based on the heart rate data;

**determining** a current recovery level for the user based on the prior sleep activity for the user;

**generating** a first recommended strain for new training activity by the user based on the current recovery level; and

**determining** a second recommended strain for the user by adjusting the first recommended strain according to the phase within the hormonal cycle.